IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Quality Time, Inc., and Tammie
Geldenhuys,

        Plaintiffs,

        vs.                       Case No. 12-1008-JTM

West Bend Mutual Insurance Company,

        Defendant.

MEMORANDUM AND ORDER

This is an action for insurance coverage arising from the collapse of a bowling alley

in Independence, Kansas. The matter is before the court on five motions for summary

judgment by the parties. The court denies all motions, but renders specific conclusions of

law which will remain relevant and binding during the trial of the matter.[1]

Summary judgment is proper where the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show there is no

genuine issue as to any material fact, and that the moving party is entitled to judgment as

a matter of law. Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the

court must examine all evidence in a light most favorable to the opposing party. *McKenzie*

*v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary

judgment must demonstrate its entitlement to summary judgment beyond a reasonable

doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party

---

[1] The submission of *four* separate partial summary motions, with many of the
motions and corresponding responses involving repeated recitation of the same facts,
creates marked inefficiencies and unnecessarily consumes the time of litigants and the
court. It is a practice the court discourages.

need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*Findings of Fact*

On June 28, 1999, plaintiff Tammie Berry and her husband Dan acquired title to the Quality Times bowling alley in Independence, Kansas. The couple were divorced in 2003, and Tammie was awarded the bowling alley, subject to the mortgage of First National Bank of Independence, Kansas. That mortgage arose from a 1999 SBA loan to the Berrys in the amount of $231,000.

On January 17, 2002, Tammie established Quality Time, Inc. to operate the alley, but she continued to hold title to the alley in her individual name. Following her divorce, Tammie married Gerhard Geldenhuys.

On May 3, 2007, Quality Time, Incorporated issued 51 shares of common stock to Tammie, and 49 shares of common stock to Gerhard. Tammie and Gerhard are the only stockholders of the corporation.

The bowling alley was operated by Quality Time, Inc., but the alley and its contents were owned by Tammie Geldenhuys. Tammie Geldenhuys has testified that Quality Time, Inc. leased the alley, although there was no lease agreement and the corporation paid no rent.

Sometime prior to October 12, 2010, Geldenhuys met with Kent Carpenter who is an insurance agent and broker employed by Wilson County Insurance Agency since 1985. Wilson County Agency is an independent insurance agency, which offers multiple lines of insurance from multiple insurance carriers, including West Bend.

The plaintiffs contend that the Wilson County agency had a contractual relationship with West Bend Mutual Insurance Company, and is authorized to issue binders for West Bend. West Bend agrees that it had a contract with the agency, but that it could not issue policies for West Bend, and could issue a binder only after West Bend's underwriting team approved an application, issued a rate quote, and authorized issuance of a binder. In addition, West Bend has submitted evidence that Carpenter was not acting as its agent, and that West Bend only uses independent agencies, such as the Wilson County Agency.

Geldenhuys lived in Neodesha, Kansas for a period of time and knew Carpenter. In fact, Carpenter gave her golf lessons and sold her other policies, including vehicle and homeowners insurance.

Geldenhuys handled the financial structure for the bowling alley. She, rather than her husband Gerhard, did most of the bookkeeping and was more knowledgeable than he concerning the financial condition of the business. Gerhard was South African, with a high school degree and two years of technical training in electric technology. While less knowledgeable than his wife, about the bowling alley, Gerhard has acknowledged that he

participated in and had knowledge concerning the financial structure and condition of Quality Time Lanes.

Geldenhuys authorized her husband to speak with Carpenter in order to obtain a policy of insurance for the alley. Carpenter prepared a draft of the application using the information contained in the former property insurance policy that was issued by State Auto Insurance Companies, which was issued to Quality Time Lanes. Working off the older policy, which was provided by Gerhard, Carpenter listed Quality Time Lanes as the named insured

Carpenter took the application draft, along with the former State Auto policy, to Gerhard and they reviewed the application. While he does not recollect their precise conversation, Carpenter has testified that he would have reviewed each and every item on the application with Gerhard to confirm its accuracy. He testified that, if Gerhard had told him any taxes were owing on the alley or that the alley was actually owned by Tammy Geldenhuys (rather than Quality Time Lanes), he would have listed these facts on the application. According to Carpenter, Geldenhuys affirmatively told him that there were no tax liens with respect to the property.

According to Gerhard, Carpenter merely presented the draft application "and he said, 'Okay, here's the forms, just sign here, here and here,' so I signed." Gerhard's testimony, however, is somewhat inconsistent with the contention that Carpenter simply thrust the forms at him and he immediately signed them. Asked later in his deposition why, if he knew there were back taxes due on the bowling alley, he did not tell Carpenter, Gerhard later testified

> Well, I think I mentioned that there's taxes owed....but, tax liens, he didn't ask, he would read the question and on the question, I answered on the question that he read to me.

Gerhard also agreed that the information on the application form was derived from "the actual questions he asked you and the answers you gave him." Gerhard thus indicated that

Carpenter did at least read through some of the questions. Gerhard also testified that he has no reason to dispute Carpenter's testimony that all of the information contained in the Application was given to Carpenter by Gerhard.

At one point in his deposition, Gerhard stated that he told Carpenter that the alley owed taxes. But the plaintiff also cites another portion of the deposition, in which Gerhard seeks to explain answering no to a question about the existence of tax liens by claiming that he understood the question to be directed at him personally, rather than his wife or the bowling alley.

According to the plaintiff, Gerhard did not feel he was the proper person to answer the questions, and urged Carpenter to contact his wife. Gerhard states that he gave Carpenter her cell phone number, but Carpenter failed to contact the plaintiff. The plaintiffs state that, at the time of the application, Gerhard did not have any history of bankruptcy, nor did he have any type of tax lien. However, as West Bend notes, the plaintiffs' only evidence for this assertion is the statement by Tammie Geldenhuys, who merely indicated that she did not know of Gerhard's business history, and acknowledged that there was a tax lien against his business.

West Bend, as noted earlier, has provided evidence that Carpenter went over each of the questions on the application with Gerhard, who had the opportunity to correct any errors. Gerhard knew who the true owner of the bowling alley was, but made no corrections. And Carpenter has testified that he went over everything in the application with Gerhard.

There is some evidence that Gerhard did in fact have such liens, and that plaintiff Geldenhuys and her husband went over the application together. Carpenter testified that Geldenhuys affirmatively told him there were no tax liens on the property. He has also stated that Carpenter also testified that Tammie Geldenhuys played no role in procuring the insurance.

After taking the application, Carpenter wrote a note to West Bend's underwriting department stating, "Sorry we are so late. State Auto has not done their best on this one and I think we can compete. We have a good in and if we beat them, just a little, I think we can write this account."

On October 13, 2010, Carpenter faxed to West Bend an Accord 125 Application for insurance, which listed under "Applicant Information" Quality Time Lanes as the only named insured and provided a Federal Employer Identification Number of 26-004-0519 for the applicant. The Federal Employer Identification Number (FEIN) identified in the application documents was Quality Time, Inc.'s FEIN. The Application noted that it was a "RUSH," and the proposed effective date of insurance was to be October 16, 2010. The application lists Quality Times Lanes as both the applicant and the named insured. Tammie Geldenhuys is merely listed under the heading "Applicant Information."

The Application indicated that Quality Time Lanes was the owner of the alley (not just a tenant), and that the alley had no bankruptcies, tax or credit liens in the last five years. The Application was signed by Carpenter, but not by any representative of the alley.

The Application included a "Bowling Center Questionnaire" which had been filled out and signed by Carpenter and Gerhard, who signed on behalf of Quality Time. One of the questions was ""Have you ever had a bankruptcy or outstanding tax liens? (i.e. Property tax, sales tax, unemployment tax, etc.)"

As noted earlier, the plaintiffs assert that Gerhard understood the question to be directed to him personally, and answered "No." However, this portion of the Questionnaire also asks "ANY BANKRUPTCIES, TAX OR CREDIT LIENS *AGAINST THE APPLICANT* IN THE PAST 5 YEARS?" (Emphasis added.) The Applicant is explicitly listed as Quality Time Lanes, not Gerhard Geldenhuys. A rational fact finder could conclude that a person completing the Questionnaire should have understood the question meant the bowling alley.

After receipt of the application, Gary Halverson of West Bend issued a quote to Carpenter on October 14, 2010. Along with the quote, Halverson explained that the proposal was subject to change based on West Bend's receipt and review of the following: (1) Five years of hard copy loss runs, (2) Years of building improvements made, (3) Acceptable inspection from NSI regional sales manager, and (4) Verify that non-flammable refinishing material is used on lanes. Halverson also explained that he needed a signed Accord 125 Application returned, since the original Application was not signed by the Applicant. The quote included a Binding Instruction Worksheet for Carpenter to fill out.

On October 15, 2010, Carpenter returned a filled-out Binding Instruction Worksheet. Thereafter, Carpenter was authorized to bind coverage on behalf of Quality Time Lanes, which he did.

On October 20, 2010, Carpenter issued an "Insurance Binder" listing NSI/West Bend as the insurer, and Quality Times Lanes as the insured. The Binder insured the bowling alley building for $516,000, less $1,000 deductible, and personal property for $150,000, less $1,000 deductible. The Binder listed First National Bank of Independence, Kansas as the "mortgagee." West Bend does not dispute the fact that such a binder was issued, but cites facts showing that a policy is issued only after the West Bend underwriting team approves the application, issues a rate quote, and authorizes the issuance of a binder.

On October 26, 2010, Halverson sent another request to Wilson County Agency for (1) five years of hard copy loss runs, (2) years of building improvements made, (3) verification that non-flammable refinishing material is used on lanes, (4) a signed Accord 125 Application, and (5) verification of the entity. He requested verification of the entity because the initial Application did not state the type of entity. Carpenter sent the requested information, including an Accord 125 application signed by Gerhard Geldenhuys. Carpenter indicated the entity as Quality Time, Inc., and stated in writing to "change the named insured to read: Quality Time, Inc."

Thereafter, NSI Underwriting contacted Carpenter to determine if there was a change in ownership, and he stated that there was no change in ownership.

Had a new or different owner of the Property been identified, West Bend would have required a new application process for the newly identified owner. West Bend, per the request of the insured, changed the named insured to Quality Time, Inc. effective January 7, 2011.

According to Carpenter, after West Bend asked for verification of the insured entity, Carpenter testified that he asked Gerhard who the owner of the property was. Gerhard told him that it was the corporation, Quality Time, Inc. Thus, he wrote back to West Bend and told them that the named insured should be changed to Quality Time, Inc.

Tammie Geldenhuys did not directly give Carpenter any information that went into the application for coverage, and she was not listed as the applicant on the application documents. The application documents also do not identify Tammie Geldenhuys as an additional named insured. Her interest in the alley was not disclosed in the application documents or at the time the Application was submitted, and she did not sign any of the application documents. Instead, as noted, she was listed in the application simply as a source of "Applicant Information."

It is uncontroverted that, at the time the Application was submitted, Tammie Geldenhuys owed significant back property taxes on the Property. In addition, Quality Time, Inc. also had sales tax and payroll tax issues. There is also evidence that at the time of the application, Tammie Geldenhuys and Quality Time were in significant financial distress.

The plaintiffs contend that, at the time of the application, there were no actual *delinquencies* by Quality Time at the time of the application, and no recorded sales tax liens against Tammie Geldenhuys, Gerhard Geldenhuys, or Quality Time. However, the evidence before the court indicates that there was a sales tax lien against Tammie

Geldenhuys in January, 2006. Further, Tammie as the owner of the alley was liable for property taxes assessed against the property. At the time of the application, there were property tax liens against the bowling alley for the first half of 2008, and the full year of 2009.

At the time of the application, Gerhard knew of these back property taxes, and that Tammie Geldenhuys owned the alley. Gerhard was also the sole owner of another business, SEK, LLC, an engine repair shop. The defendant has provided evidence indicating that SEK was also in financial trouble in that it owed significant taxes, was delinquent on its loan obligations, and was nearing the point of and ultimately did cease operating. The plaintiffs have submitted that at the time of the application, the taxes cited were then due or delinquent.

In support of their contention that the alley was free from any financial cloud, the plaintiffs cite a statement of West Bend senior claims agent Neal Pulvermacher that he has no knowledge that Quality Time Lanes had ever filed for bankruptcy or had tax liens at the time of the application. But, as West Bend points out, Pulvermacher did not issue the policy and merely indicated that he had no *personal* knowledge of any prior bankruptcies or tax liens. The NSI Division at West Bend offers insurance coverage for specialty businesses or other market or industry segments that many insurance carriers choose not to cover. One of the marketing segments for which the NSI Division will offer insurance coverage is bowling centers. When evaluating bowling centers for potential coverage, the West Bend underwriting department is particularly concerned with the financial history and stability of the business. If the business is doing poorly, West Bend's experience indicates that this creates a moral hazard for an insured and an increased likelihood of an intentional cause of loss.

As a part of the bowling center application process, the applicant is required to identify whether it owns or rents the premises to be insured. The applicant must identify

whether it has had, within the last five (5) years, any bankruptcies or tax or credit liens against it, is required to identify prior building improvements, and must complete and sign a separate Bowling Center Questionnaire in addition to the Application, which asks whether the applicant has had any prior bankruptcies or outstanding tax liens, including property and sales tax liens.

The NSI Underwriting Guidelines for bowling centers state that properties or applicants with outstanding tax liens, judgment, and bankruptcies are not eligible for insurance coverage. The policy in the present action was issued through West Bend's NSI Division.

West Bend relied upon the information provided by the applicant and relied on the fact that Geldenhuys was "an authorized representative of the applicant" and that he certified "that a reasonable inquiry" had been made to obtain the answers to questions in the Application. West Bend has introduced evidence showing that it would not have issued a rate quote or agreed to issue a policy if Quality Time, Inc. had disclosed its true financial condition, including its apparent outstanding tax obligations, or if the application had shown that the true owner of the alley had outstanding back property taxes or sales taxes.

For the NSI policy, West Bend retained sole authority to underwrite or rate the proposed applicant's risk for any peril, to offer a quote to the proposed insured, and to ultimately issue a policy of insurance to the proposed insured. The Wilson County Agency has no authority to provide a rate quote, does not issue West Bend policies, and makes no decisions on underwriting or rating the proposed applicant's risk for any peril. Rather, the Wilson County Agency can only submit the Application and appropriate documentation on behalf of its customer and then it can issue a binder once West Bend's underwriting team has approved the Application, issued a rate quote, and authorized issuance of a binder. In other words, the Wilson County Agency can only bind coverage on behalf of its

customer after receiving a quote from an NSI underwriter, and can only bind coverage consistent with the quote received from the NSI underwriter.

The Wilson County Agency is not employed by West Bend and has no authority to act on West Bend's behalf in evaluating and issuing a NSI general commercial liability and property insurance policy like the one ultimately offered to Quality Time, Inc. d/b/a Quality Time Lanes by West Bend in this case.[2]

The bowling alley suffered damage as the result of a collapse which occurred on July 20, 2011. The collapse began because of a failure in the bottom chords (or tension ties) of the tied arches or bowstring trusses supporting the roof. The precise cause of the collapse is disputed between the parties. After the collapse, West Bend retained the services of Semke Forensics to investigate.

On July 28, 2011 Meredith Reschley took a recorded statement from Gerhard. During that interview Reschley asked Gerhard several questions about the bowling alley, including the date it was acquired, the monthly mortgage payments, bills and taxes that were owed. Gerhard stated that although he did not know the exact amount, of property taxes that were overdue, it was in the area of $21,000.

As noted earlier, the policy included a specific provision of Additional Coverage - Collapse. The policy was in full force and effect on July 20, 2011, and had been in full force

---

[2] The plaintiffs attempt to controvert these facts by citing the testimony of agent Carpenter, but that testimony does not establish that he or his agency could bind West Bend before it approved the application, issued a rate quote, and authorized issuance of a binder. Similarly, the plaintiffs and intervenor also cite generalized testimony by West Bend agent Neal Pulvermacher. But Pulvermacher is a *claims* agent who primarily testified about the plaintiffs' damages after the collapse. Pulvermacher is not a designated corporate representative, and cannot bind West Bend. Further, as a claims agent he has no demonstrated personal knowledge of the insurance application process. Finally, as with the testimony of Carpenter, the cited testimony hardly carries the import plaintiffs seek to place upon it. Pulvermacher testified simply that "[i]t is my understanding that [Carpenter] was one of our agents [s]o he would be able to sell our policies." Of course Carpenter *could* sell policies for West Bend, but plaintiffs have failed to controvert the evidence that West Bend conditioned all such sales on underwriter approval, rate quote, and policy approval.

and effect for a period of at least 60 days preceding the collapse. In addition, the parties have stipulated that the collapse of the bowling alley meets the definition set forth in Section D.1

According to the plaintiffs, the Kansas State Fire Marshal conducted a joint investigation with the Independence Police Department and the federal Bureau of Alcohol Tobacco Firearms and Explosives, as well as Paul Carney of Fire Consulting International and Wes Wright, with Semke Forensics . The plaintiff cites a portion of the resulting report finding "no evidence of criminal involvement" in the collapse, and that the collapse was caused by a number of factors, including excessive roofing material and lack of reinforcement in the bearing walls. However, the plaintiffs have failed to show the these conclusions are grounded on admissible evidence. The report is not attested, and Carney and Wright were experts consulting on of behalf West Bend. They were not retained for purposes of testimony, and have not been designated as experts at trial.

The plaintiffs contend that the collapse clearly falls within Schedule D collapse coverage, citing the report of West Bend's structural engineering expert Mark R. Chauvin, who concluded that the collapse was caused by multiple factors, including a prolonged exposure to excessive heat and high, sustained stress levels for long periods of time which cause the wood bottom chords to degrade. The plaintiffs cite Chauvin's report, which states that over time the micro-structure of the wood "becomes damaged, checks and splits develop and the tensile strength of the members is gradually reduced."

Plaintiffs also cite the testimony of their experts Leonhard Caflisch, Kurt R. Hoigard, and Ronald L. Brown. Caflisch is a licensed architect who inspected the collapsed bowling alley on at least four or five occasions, including the night it occurred. According to plaintiff, Caflisch believes the collapse was caused by design and construction defects, coupled with years of decay and deterioration. Hoigard and Brown are structural engineers and believe that the collapse was due to excessive heat and creep deformation.

West Bend attacks Caflisch's conclusions, noting that he did no testing or calculations to support his conclusions, and was not qualified to do structural integrity assessment. In addition, it notes various grounds of attacking his conclusion, as well as those of Brown and Hoigard, on cross-examination. Further, as with Caflisch, West Bend has cited other aspects of the deposition and reports of Hoigard and Brown which would reduce the weight a rational juror might attach to their testimony.

According to West Bend, Chauvin will testify that he does not believe that heat deformation caused the collapse, and that there is no evidence of decay in the bottom cord of the Rilco tied arches and no evidence that decay caused the roof collapse. According to Chauvin, decay in wood requires a biological element. Chauvin will also testify that excessive heat did not cause a permanent and gradual loss in strength of the Rilco tied arches, and excessive heat did not otherwise cause the roof collapse. Further, according to West Bend, the plaintiffs' designated experts testified that they could not rule out intentional conduct as a contributing factor to the roof collapse.

The policy expressly provides that "We will not pay for any loss or damage in any case of: 1. Concealment or misrepresentation of material fact, or 2. Fraud; Committed by an insured at any time and relating to an insurance application, rating, claim or coverage under this policy."

The Declaration Pages of the policy provide for replacement costs for business personal property, but plaintiffs have not sought to replace any of the property in this case. Thus, under the policy, only the actual cash value of the business personal property can be recovered. Actual case value is defined as "the amount it would cost to repair or replace Covered Property with material of like kind and quality, less allowance for deterioration and depreciation, including obsolescence."

The policy provided for $150,000.00 for business personal property, subject to the

deductibles and other terms and conditions. The policy states, "We will not pay you more than your financial interest in the Covered Property.

Gerhard and Tammie Geldenhuys have provided statements of lost business personal property valued at replacement costs, but have testified that they have not attempted to evaluate and could not testify as to the actual cash value of covered property at the time of the collapse.


*Conclusions of Law*


In its first motion for summary judgment, the plaintiffs seek determinations (1) that the scoring monitors were not fixtures of the bowling alley, but personal property and thus covered under the policy; (2) that the collapse was the result of "decay," as that term is used in the special coverage for collapse due to hidden decay; and (3) that the general exclusions for collapse and wear and tear are inapplicable in light of the special coverage.

The policy protected the plaintiff's interest in the bowling alley, which was built in 1958, and provided a Special Form-Causes of Loss that included Additional Coverage-Collapse. Section D-2 of the Special Form provides:

2.  We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if the collapse is caused by one or more of the following:
    . . . .
    b.  Decay that is hidden from view, unless the presence of such decay is known to an insured prior to the collapse.
    . . . .
    d.  Weight of people or personal property.
    . . . .
    f.  Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in 2.a through 2.e., we will pay for the loss or

damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

The policy does not explicitly define the term "decay."

The policy includes a "Building and Personal Property Coverage Form, which provides for coverage to

b. Your Business Personal Property located in or on the building described in the declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property-Separation of Coverage Form: (emphasis supplied)

(1) Furniture and fixtures

(2) Machinery and equipment

(3) "Stock"

(4) All other personal property owned by you and used in your business.

According to the plaintiff, the five scoring monitors were suspended by cables from the arch trusses in the ceiling in front of the lanes. The defendant states this is an oversimplification, and presents, by the affidavit of one of its experts, a detailed description of the monitor installation:

On the interior, the ceiling finish consisted of 12 by 24 inch rectangular acoustical tiles. At the west end of the building, the ceiling tiles were fastened to 1x2 wood furring members which were fastened perpendicular to the bottom surface of the bottom chords. Over the bowling area, the ceiling system was constructed with a scalloped or sawtooth profile which allowed for indirect lighting of the bowling lanes. The sawtooth ceiling consisted of an orthogonal grid of 1x2 and 2x4 wood furring members which were hung from the arch bottom chord with 1x4 members of variable lengths.

Above the west end of the ten bowling lanes, five dual screen CRT overhead video scoring monitors were suspended from the ceiling framing. The monitors were installed between two adjacent tied arches and were installed in a line across the building width above each pair of bowling lanes. The monitors were attached to the ceiling framing by cabling. The monitor cables were attached to hooks mounted on the top of the CRT cabinets and were looped around the ceiling furring. A header assemblage, consisting of 12-foot long 2x4 and 2x8 members laid flat and nailed together, was added to the ceiling framing alongside each monitor location. However, no new or additional vertical hangers were installed at the monitor locations.

The monitors had been installed some time before 1999, prior to Geldenhuys's purchase of the alley. The five (5) bowling alley monitors were a part of the entire electronic scoring system, which is wired into a lower console attached to the floor, pin setters and sensors, and a computer system. Geldenhuys had put the alley on the market several times, and it was for sale at the time of the collapse. Geldenhuys intended the electronic scoring system, including the monitors, to remain installed on the alley after it was sold.

The plaintiffs state that West Bend's expert opined in his report that excessive heat in the attic and prolonged axial and flexural tension on the bottom chords were additional factors in the collapse, because excessive heat and prolonged stress may cause deformation in the microstructure of the wood, reducing its tensile strength. West Bend responds by noting that its expert has not yet been deposed, and that the report itself is not admissible evidence. West Bend has submitted an affidavit by its expert, Mark Chauvin, stating that he found no evidence of decay in the bottom cord of the Rilco tied arches and no evidence that decay caused the roof collapse. Chauvin also avers that the collapse was due to ordinary wear and tear, specifically by creep rupture or cumulative damage, or from long term exposure to the roof and dead load weight, along with naturally occurring wood defects in the tied arches.

In its Answer to the Amended Complaint, West Bend listed as affirmative defenses both the Wear and Tear Exclusion and the Collapse Exclusion.

The plaintiffs argue that the Schedule D Collapse provision applies, since the collapse was caused by the scoring monitors which should be considered personal property because they are "portable ... and can easily be removed by cutting the suspension cables or releasing them from the clamp," which can be done "without any damage to the building structure." (Dkt. 75, at 7-8). But the plaintiffs have supplied no evidence as to any of these contentions; these contentions only appear in the argument portion of their brief.

There is no evidence as to the size or weight of the monitors. There is no evidence that the monitors can be removed from the alley without damage. In contrast, there is some evidence that the monitors are integrated into the building's electrical system, and that the alley's previous and current owners have viewed the monitors as something which should remain with the building after any sale. A rational fact finder could conclude that the monitors were fixtures of the alley as that term is defined under Kansas law. *See, e.g., Peoples State Bank of Cherryvale v. Clayton*, 2 Kan.App.2d 438, 580 P.2d 1375 (1978). As the plaintiffs have the burden as the moving party to demonstrate beyond a reasonable doubt that the monitors are personal property, the motion for summary judgment must be denied.[3]

Plaintiffs also argue that, even if the monitors are fixtures under standard usage and Kansas law, they should be deemed "personal property" in light of Subsection A(1)(b) of the Coverage Form. However, this portion of the policy is an entirely separate provision generally providing for coverage for "Business Personal Property;" it did not explicitly or implicitly attempt to define "personal property" for all purposes. The court cannot labor to create ambiguity where none exists. *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 575, 56 P.3d 789 (2002). There is nothing in the policy to suggest that "personal property" as

---

[3]After the completion of the briefing on the summary judgment motion, the plaintiffs filed a Supplement of Additional Authority, which cites the recent decision of the Kansas Supreme Court in *City of Wichita v. Denton*, Case No. 97,952, 2013 WL 50250 (Jan. 4, 2013), which concluded that a billboard fixed in concrete was personal property, and also stressing that the prior owners of the alley listed the monitors as security for a Small Business Administration loan in a 1999 agreement.

The Supplement, improperly filed without leave of court, does not support an award of summary judgment. As to the SBA filing, a movant may not rely on evidence which is presented for the first time in reply. *See, e.g., Brimm v. Building Erection Services*, 311 F. Supp. 2d 1231, 1234 n.1 (2004). And *Denton* merely applied prior Kansas law in a condemnation action, finding that the billboard was not a fixture by citing other cases dealing specifically with billboards, coupled with the "undisputed and overwhelming" evidence that both the landowner and the sign owner intended that the billboard would be removed after the end of the lease. The evidence in the present action is sharply disputed.

used in Schedule D should be given anything other than its ordinary and plain meaning, which would exclude real estate "fixtures."

Next, plaintiffs contend that the collapse is covered under Schedule D as it was caused by "decay." Neither plaintiffs nor defendants identify any Kansas cases defining the term "decay" in the context of insurance coverage. The plaintiffs cite *Certain Underwriters v. KKM Inc.*, 215 S.W.3d 486 (Tex.App. 2006), which held that decay means a "slow change from a state of soundness or perfection," and is not limited to the decomposition of organic materials such as wood, and *Stamm Theatres v. Hartford Casualty Ins. Co.*, 93 Cal.App.4th 531, 113 Cal.Rptr.2d 300 (2001), where the court defined the term to mean "gradual deterioration to a weakened state."

West Bend argues that the term "decay" should not be broadly interpreted to include "any gradual loss in strength without qualification," and argues that as applied to wood, decay "must involve some type of rot or organic composition." (Dkt. 92, at 21). In support of its argument, West Bend cites *Arkin v. Firemen's Fund Insurance Co.*, 492 S.E.2d 314 (Ga. App. 1997), which observes that "Decay is rot; the decomposition of organic matter as a result of bacterial, fungal, or insecticidal action, resulting in destruction or dissolution," and *Whispering Creek Condo. Owners Ass'n v. Alaska National Insurance*, 774 P.2d 176, 180 (Alaska 1989).

These cases do not provide strong support for West Bend's argument. In *Arkin*, the court held that erosion leading to the damage to a culvert was not covered under an insurance policy covering building damage due to "hidden decay" for multiple reasons, because the culvert was not a "building," the eroded soil was not "decayed," and the damage was not "hidden." 492 S.E.2d 314, 317 n. 3. In *Whispering Creek*, the court stated that the distinction between "hidden decay" and "rot" was "a distinction without a difference," but this conclusion was explicitly grounded "[o]n these facts," and because defendant

insurer explicitly "recognizes that 'decay' and 'rot' are synonymous terms and concedes that the condition ... was caused by rot."

The other decisions cited by West Bend are not particularly helpful to its argument. In *Panorama Village Condo. Owners Assoc. Bd. of Dirs. v. Allstate Ins. Co.*, 26 P.3d 910, 924 (Wash. 2001), which involved a collapse due to alleged "hidden decay," the court focused on the meaning of the term "hidden," not "decay." In a similar case in *Norfolk & Dedham Mutual Fire Insurance v DeMarta*, 799 F. Supp. 33, 36 (E.D. Pa. 1992) the court observed that "[t]he definition of "decay" as it pertains to material things is: 'Wasting or wearing away, disintegration; dilapidation, ruinous condition.'" (quoting IV OXFORD ENGLISH DICTIONARY, 322 (Clarendon Press, 2d Ed.1989)).

In sum, none of the defendant's cited authorities stands for the proposition that, in cases of damage to a building through a collapse caused by "hidden decay," that "decay" is restricted to cases of rot. All of the cases rely on standard dictionary definitions of "decay" which include the concept of "rot" but are not restricted to it.

Thus, the American Heritage Dictionary (New College Edn. 1976) includes a usage note explaining the variations in the synonyms for "decay," which are not restricted simply to "rot" —

> **Synonyms**: *decay, rot, putrefy, spoil, crumble, molder, disintegrate, decompose*. These verbs all refer to gradual change marked by destruction or dissolution. *Decay*, which can apply to physical change figuratively to breakdown of the mind, morals, or the like, usually implies a stage of deterioration short of destruction. *Rot* has both physical and figurative use, and *putrefy* largely physical; both stress later stage of deterioration marked, in physical contexts, by offensiveness to smell and sight. *Spoil* can refer to organic decay or figuratively (and transitively) to impairment of character of a person. *Crumble* and *molder* apply mostly to physical breakdown of a substance into small pieces or, in the case of *molder*, into dust. *Disintegrate*, which has physical and figurative use, refers to complete breakdown into component parts; it implies as well the destruction of usefulness or integrity. *Decompose* is largely restricted to the breakdown of substances into their chemical components.

Webster's Third International Dictionary also indicates that "decay" may be understood to mean more than organic decomposition:

**de-cay** \də'kā, dē-\ *vb* -ED/-ING/S [ME *decayen*, fr. ONF *decair*, fr. LL *decadere* to fall, sink, fr. L *de* down, away + *cadere* to fall ...] *vi* **1 a** *archaic* : to decline from a prosperous condition <families ... ~*ed* into the humble vale of life — Sir Walter Scott> **b :** to pass gradually from a comparatively sound or perfect state to one of unsoundness, imperfection, or dissolution <where wealth accumulates and men ~ — Oliver Goldsmith> **2 :** to decrease in quality, volume, activity, or force : dwindle away <the voices ... ~*ed* and died out upon her ear — Thomas Hardy> **3 :** to fall into physical ruin <the old house ~*ed* from lack of repairs> **4 :** to decline in health, strength, vigor, or freshness <a mind beginning to ~> **5 :** to undergo decomposition : ROT <fruit ~*s* in the sun> ~ *vt* **1** *obs* **:** to cause to decay : IMPAIR <infirmity that ~*s* the wise — Shak.> **2 :** to destroy by decomposition : rot <rain and sun ~*ed* the building>

**syn** DECOMPOSE, ROT, PUTREFY, SPOIL, DISINTEGRATE, CRUMBLE: DECAY indicates deteriorating change, often gradual, from a sound condition or perfect state <bruised apples *decaying* quickly> <*decaying* teeth> <with huge machines left to rust and *decay* — *Amer. Guide Series: Texas*> <the Aztec regime and culture collapsed and the native crafts and arts *decayed* — R.W. Murray> ....

Accordingly, *Whispering Creek*, which suggests that the dictionary (citing Webster's New International Dictionary, Unabridged (2d ed. 1960)) "equates the terms 'rot' and 'decay'" oversimplies. All dictionaries consulted by the court indicate that while "rot" is a form of "decay," the latter term is not restricted to organic decomposition. Rather, "decay" may more broadly understood to mean (in the words of Webster's Third International) a "deteriorating change, often gradual, from a sound condition." While rotting apples or decaying teeth are examples of "decay," so is rusting machinery.

Kansas law requires that words used in insurance contracts be interpreted according to ordinary or popular understanding. *O'Bryan*, 274 Kan. at 576. But if a given term is susceptible to more than one meaning, the court will adopt the meaning most favorable to the insured. *Id.* Because the term decay may, consistent with popular understanding, be construed to mean gradual deterioration or degradation, without organic decomposition, this is how the court construes the term here. The court specifically rejects the insurer's argument (Dkt. 92, at 21) that "decay" is somehow restricted to rot or organic decay. *See*

*Certain Underwriters*, 215 S.W.3d at 492-93 (rejecting argument that "decay" was restricted to deterioration of organic matter); *Stamm Theaters*, 93 Cal.App.4th at 540-41 (insurer's suggested restriction of "decay" to mean "rot" was "unduly narrow").

Of course, the court cannot grant summary judgment in favor of the plaintiffs by finding that their damages were in fact covered under Schedule D. The plaintiffs have the burden of establishing coverage under the policy, and the uncontroverted facts before the court do not establish beyond a reasonable doubt either that the collapse was due to decay or that the decay was hidden in nature. The defendant asserts that its expert will testify that degradation of the roof due to heat did not cause the collapse. The trier of fact will determine whether the collapse was due to decay as the term has been defined by the court. In their Reply, the plaintiffs specifically acknowledge that they "are not asking the Court to rule as a matter of law that coverage exists under the Additional Coverage-Collapse endorsement of the policy," (Dkt. 94, at 14), but merely seeking rulings of law as to the proper construction of the policy.

Finally, the plaintiffs argue that the explicit coverage under Schedule D Additional Coverage - Collapse displaces the general exclusions for "collapse" and "wear and tear" contained in the Section B.2 Causes of Loss-Special Form contained in the policy.

West Bend argues that the Section B.2 decay exclusion is not directly in conflict with the Schedule D collapse coverage, in that damages caused by decay are generally excluded, but the policy will provide coverage for damages cause by a collapse which in turn is caused by *hidden* decay. Citing the Merriam-Webster Online Dictionary's definition of "wear and tear" as "the loss, injury, or stress to which something is subjected by or in the course of use; especially: normal depreciation," West Bend argues that "it is abundantly clear that 'wear and tear' is a distinct term from decay." (Dkt. 92 at 24).

The court disagrees, and finds that Schedule D provides a positive assurance of coverage in the event the insured demonstrates damage due to collapse caused by hidden

decay. If the facts establish that such a hidden decay collapse occurred, coverage exists, notwithstanding any general exclusion for collapse, or for wear and tear. *See Malbco Holdings v. AMCO Insurance*, 629 F.Supp.2d 1185, 1192 (D. Or. 2009) (dismissing affirmative defenses based on general policy exclusions where insured advanced claim under specific additional collapse coverage); *Certain Underwriters*, 215 S.W.3d at 494-95 (same).

In their second motion for summary judgment, the plaintiffs seek reformation of the insurance contract on grounds of mutual mistake. In conjunction with their motion, the plaintiffs present evidence that Quality Time, Inc. took out a loan from the First National Bank on December 24, 2010, for $34,116.07. The loan was secured by a second mortgage on the bowling alley, a security interest in contents, and a personal guarantee by Tammie and Gerhard. As of July 19, 2012, the balance owed on the two loans to First National Bank totaled $186,275.10

The plaintiffs argue that a mutual mistake of fact occurred as to the identity of the named insured. Given this putative mistake, plaintiffs argue, citing decisions such as *Stamps v. Consolidated Underwriters*, 205 Kan. 187, 468 P.2d 84 (1970), that reformation in such cases should be readily granted. They also contend that Tammie Geldenhuys's ownership of the alley was a matter of public record, which West Bend could have found by reviewing public records, and that "[t]here is no reason to believe that West Bend would have refused to issue a policy had it known that Tammie Geldenhuys was the owner of the bowling alley." (Dkt. 81, at 6-7).

The plaintiffs' argument rests upon vigorously disputed facts and accordingly summary judgment cannot be granted. West Bend has introduced evidence showing that it would not have approved an application for bowling alley coverage had it been aware of the alley's financial situation. And plaintiffs have cited no authority establishing that an insurer may not take the representations in an application at face value, but must some

how conduct an independent search to determine the accuracy or truthfulness of the information in an application.

To establish reformation, plaintiffs must show a mutual, not a unilateral mistake as to the nature of the insurance contract. *Brown v. Equitable Life Assurance Soc. of the United States*, 766 F. Supp. 928 (D. Kan. 1991) (citing cases). Contrary to the plaintiff's argument that reformation should be freely given, the remedy is considered extraordinary, and will be approved only "with great caution." *Monarch Insurance v. Lankard*, 715 F. Supp. 304, 306 (D. Kan. 1989).

*Stamps*, cited by the plaintiffs, approved of a reformation of an automobile policy to provide for full family coverage, but this was explicitly grounded on the factual determination, following a trial, that the insurer "knew the type of coverage desired, could have afforded such coverage by issuing separate policies, charged the maximum premium, and deliberately issued a policy affording substantially less coverage." 205 Kan. at 198, 46 P.2d at 93. The Kansas Supreme Court simply determined that these findings were supported by substantial evidence. *Id.* This standard is of course radically different from the plaintiffs' burden on summary judgment. Far from showing beyond a reasonable doubt that West Bend knew of the alley's financial condition and turned a blind eye to it, there is substantial evidence showing that West Bend was unaware of the real identity of the insured and took steps to resolve it.

If the evidence adduced by West Bend is believed, a rational fact finder could conclude that West Bend was unaware of the real facts, and was indeed actively misled as to the underlying circumstances of the bowling alley and its financial condition. While the fact finder could also weigh the evidence and determine that there was an innocent and mutual mistake of fact, this is a weighing of the evidence which is not appropriate for the court on summary judgment.

Reformation remains a potential remedy in the action, but it must be resolved at trial. Further, under the general rule of Kansas law, "a broker or agent who is employed to procure insurance becomes the agent of the person for whom the insurance is procured." *Golden Rule Ins. Co. v. Tomlinson*, 47 Kan.App.2d 408, 423, 277 P.3d 421 (2012). Thus, to establish reformation at trial, plaintiffs must establish that they and West Bend (not simply Carpenter) were mutually mistaken as to the identity of the named insured.[4]

The court finds that a rational fact finder could determine that reformation is not warranted. Gerhard knew that Tammie was the true owner of the property, yet signed the application indicating that Quality Time was the owner. Carpenter testified he went through each item on the application and obtained confirmation on each point. Gerhard specifically testified he had no reason to dispute that point. Quality Time, Inc. merely operated the alley as a lessee. Carpenter signed the initial application. Gerhard signed the Questionnaire which explicitly defined Quality Time Lanes as the applicant and owner of the Property, giving Quality Time Inc's FEIN Number. Contrary to plaintiff's contention, the policy requested was not an "individual" policy, and omitted Tammie's name. West Bend authorized issuance of a binder but requested a signed application and requested verification of the entity. Carpenter again spoke with Gerhard, and ultimately asked that

---

[4] In their Reply, plaintiffs argue that a question of fact exists as whether Carpenter acted on their behalf or that of West Bend. (Dkt. 118, at 9-10). The cited authorities, however, all deal with generic issues of agency, not independent insurance agents. *See Brown v. Wichita State Univ.*, 217 Kan. 279, 540 P.2d 66, 75 (1975) (aviation services contract), *overruled on other grounds by Brown v. Wichita State Univ.*, 219 Kan. 2, 547 P.2d 1015 (1976); *Greep v. Bruns*, 160 Kan. 48, 159 P.2d 803 (1945) (sales to grain elevator); PIK 4th § 107.1.

In contrast, as noted above, Kansas law generally considers independent insurance brokers such as Carpenter to be agents for the insured. "[A] broker or agent who is employed to procure insurance becomes the agent of the person for whom the insurance is procured." *Golden Rule Ins. Co. v. Tomlinson*, 47 Kan.App.2d 408, 277 P.3d 421 (2012). The same court stressed that "agency must be established by some action of the principal, not merely based on acts or representations of the claimed agent." *Id.* Plaintiffs have pointed to no facts which would justify altering the application of this general rule.

the named insured be changed to Quality Time, Inc. Geldenhuys said she reviewed it, but she made no effort to have it changed or amended.

Conversely, West Bend seeks summary judgment requesting a determination that the insurance contract cannot be reformed, and that Quality Time, Inc., is merely a lessee of the alley, having no insurable interest in the property. With respect to the former argument, West Bend cites *Shelter Mutual Insurance Co. v. Littlejim*, 927 F.2d 1132, 1135 (10th Cir. 1991) for the proposition that Geldenhuys, who was not a party to the insurance policy, cannot seek reformation. At the same time, West Bend argues that Quality Time, Inc., cannot obtain reformation of the policy, and indeed should be dismissed from the action, on the grounds that it has no actual insurable interest in the bowling alley.

Of course, the end result of West Bend's argument would be that, even if there were indeed a mutual mistake of fact, the insurance policy could not be reformed because no one is authorized to ask for that relief. The court rejects this result, but in any even the court will deny West Bend's motion for summary judgment because it again reflects an argument grounded in the factual dispute surrounding the creation of the policy. West Bend's discussion of that issue as well as the issue of Quality Time's interest in the property (Dkt. 102, at 28-41) is grounded on disputed facts, particularly the exact nature of the communications between Gerhard and Carpenter, and the intent of the parties. West Bend also contends that, even if a mutual mistake of fact existed, reformation is precluded by the plaintiffs' unclean hands. However, the court again finds that this issue is correctly resolved by the trier of fact following appropriate instruction by the court.

In their third motion for summary judgment, the plaintiffs seek to preclude West Bend from advancing any affirmative defense grounded on intentional damage to the property under within the Section B.2.h of the policy. The plaintiffs note that in its answers to interrogatories, West Bend did not identify any facts supporting its contention of intentional damage, and also contends that the reports of the state fire marshal and

defendant's expert Chauvin fail to set forth any determination that the collapse was intentional.[5]

West Bend responds by stating that the interrogatories were issued prior to the completion of discovery, and that it objected to this specific interrogatory at the time as vague and ambiguous, and plaintiffs never responded to the objection. West Bend further notes that plaintiff's motion for summary judgment was submitted even before the end of discovery, that the state fire marshal's report merely determined that the collapse was not due to fire or explosion, and in any event is inadmissible hearsay. Chauvin's report indicates that the collapse began with the failure of the bottom chords of the Rilco tiled arches, but does not indicate that the collapse was accidental or intentional.

West Bend further notes that the bowling alley closed for the July 4, 2011 holiday weekend, and did not reopen prior to the July 20, collapse. West Bend has supplied evidence hat at the time of the collapse, Tammie Geldenhuys owed some $25,000 in back taxes on the alley, with some going back two and a half years. Quality Time, Inc., also had sales and payroll tax issues.

At a time prior to July 4, 2011, Quality Time turned off the gas and cable to the alley. Neither had been shut off before (except for very brief interruptions of the gas supply during repairs). Gerhard and Tammie Geldenhuys removed their personal belongings from the alley shortly before the collapse.

---

[5] In addition to the foregoing, the plaintiffs by supplemental memorandum have cited a series of e-mails between Meredith Reschly of West Bend, and Terry Hugo, who made a third-partly liability insurance claim for $350 for debris removal from the alley, in which Reschly at one point states that West Bend had "found no negligence on the part of their insured to have caused" Hugo's loss. But that is not inconsistent with West Bend's reliance here on the Section B.2.h exclusion: it is not arguing coverage is excluded because the plaintiffs negligently caused the collapse, but that they did so intentionally, by criminal or dishonest act.

Geldenhuys also told the bowling alley vendors to come and get their equipment, and most had done so shortly before or on the day of the collapse. Quality Time, Inc. d/b/a Quality Time Lanes had emptied and shut down its bank accounts.

Prior to the collapse, Quality Time, Inc. had made the decision to permanently shut down the bowling alley because it was financially insolvent. There were also outstanding loan and mortgage obligations attached to the alley. In June and July, 2011, Geldenhuys was not able to meet her loan payment for the Property (prior to the collapse).

Clearly, Quality Time, Inc. and the Geldenhuys were in very poor financial condition at the time of the collapse. Geldenhuys testified:

Q.    How would you define your-- or describe your financial condition middle of July, 2011?

A.    Well, without a doubt you can see how the business has done the last three years. You can see what the economy has done. Being in a small business is tough. And we have several friends in small businesses and everybody is trying to hang on to get through a bad time. And that's why we were relooking at what we were doing, because obviously it's a tough time.

. . . .

Q.    In-- say July 15, 2011, did you believe that your policy provided coverage if the building collapsed?

A.    I knew we had a collapse policy. I knew we had a policy that insured the building. I didn't know any specifics or anything, because it-- you know, an insurance policy is something in the very beginning you set up and you-- you spend time going through it then and you just pay the premiums.

Q.    When was the last time you looked at your insurance policy or asked someone to look at the insurance policy prior to the collapse?

A.    Probably at the point when we purchased it.

. . . .

Q.    But on the two businesses, you owed substantial tax debt and you were behind in payments and you couldn't cash flow those businesses. Is that fair?

A.    I would say, yes, that the economy was putting us in that position.

Geldenhuys was the sole owner of another business, SEK, LLC, an engine repair shop, which was also in financial trouble in that it owed significant taxes, was delinquent on its loan obligations, and was nearing the point of and ultimately did cease operating. Gerhard let his insurance policy lapse on his SEK business, but he decided to maintain the policy on the bowling alley.

Gerhard agrees the Geldenhuys were in desperate financial condition in July, 2011.

Gerhard became an electrician while living in South Africa, where he had an exploration (drilling) business and he farmed on the side. He was also in the South African army for 2 years. He currently works for CVR Energy, which makes ammonium and fertilizer. He started that job on July 25, 2011, having applied for and accepted it prior to the collapse.  When asked why he did not seek help financially from family or friends, Gerhard testified, "If you saddle up a horse, you had to ride until it dies .... And me as a person always will find a solution to fix a problem."

The only recent work on the alley was recarpeting; there were no major repairs completed, and no ongoing construction at the time of the collapse.

Tammie Geldenhuys testified that the walls were not bulging and there was no cracked mortar or anything similar. No one had otherwise told her that the walls were sagging or bulging. Gerhard also had not noticed any change of any kind in the building. From his perspective, the building was safe and there was nothing out of the ordinary going on. He testified the walls were not cracked, out of plumb or sagging, and he was not aware of any rot anywhere on the building.

After the bowling alley had been closed, but prior to the collapse, Tammie and Gerhard had been in the bowling alley on several occasions.

Quality Time, Inc. agents were the only persons to have unsupervised access to the interior of the Property.

On the day of the collapse, Tammie and Gerhard had told patrons to come get their belongings. On that evening, they sat at the bowling alley with several friends drinking beer and waiting for patrons to do so. Everyone left, including Tammie and Gerhard, at approximately 9:00 p.m.

The roof collapsed approximately fifteen minutes later.

Prior to the collapse, Geldenhuys had the bowling alley on the market for sale on multiple occasions including at the time of the collapse. In 2010, she had a contract to sell the property to Van Ward and John Heathman for $344,000.00. The buyers ultimately backed out after an inspection of the property.

Shortly before the collapse, Dwight Coda offered to buy the bowling alley for $150,000.00. This offer was rejected.

The plaintiffs' designated experts testified that they could not rule out intentional conduct as a contributing factor to the roof collapse. Plaintiffs' expert Brown could not make a determination to a reasonable degree of certainty as to the truss member where the failure initiated. He agrees that it would not take much to knock the building down.

According to Chauvin, the collapse initiated because of a failure in the bottom chords (or tension ties) of the tied arches or bowstring trusses supporting the roof. Based on the known weight loads, Chauvin believes that the bottom chords would have been near but not past their ultimate weight bearing capacity prior to the collapse.

As the party seeking summary judgment, the plaintiffs have the burden of showing beyond a reasonable doubt that the collapse was accidental in nature. The defense of intentional damage in an insurance action may be established by circumstantial evidence. *See Newman v. State Farm Fire and Casualty*, 290 Fed.Appx. 106, 112 (l0th Cir. 2008) (defense of arson "may be proved by circumstantial evidence."); *Bookout v. Columbia Nat'l Ins.*, No. 11-1064, 2012 WL 4049821, at *4 (D. Kan. Sept. 13, 2012) (burden of affirmative defense can be proven by either direct or circumstantial evidence).

West Bend concedes (Dkt. 100, at 20) that it has no "smoking gun" such as videotape footage of the plaintiffs actually causing the collapse, but such evidence is not required. The defendant has provided evidence from which a rational fact finder could conclude that they had both motive and opportunity to cause the collapse. The plaintiffs were in desperate financial condition, and had undertaken to shut the bowling alley down. Their attempts to find a buyer were unsuccessful. Gerhard Geldenhuys allowed the insurance policy on his business to lapse, but Geldenhuys kept the West Bend policy in place for the bowling alley. The collapse occurred immediately before Gerhard was to begin a new job which would have kept him from working at the alley. The Geldenhuyses removed their personal belongings from the alley, and directed vendors to remove their equipment shortly before the collapse. The roof, which had been built and had lasted since 1958, collapsed just fifteen minutes after the Geldenhuys say they left the alley. And while the expert evidence shows *where* the collapse began, it does not establish beyond a reasonable down *how* it began. The plaintiffs' experts specifically declined to exclude intentional conduct as the cause of the collapse. According to the defendant's expert, the addition of extra weight to the roof supports would have been sufficient to cause the collapse.

Taken collectively, the evidence does not support a conclusion beyond a reasonable doubt that the collapse was an accident. The court finds that the issue of intentional destruction must be resolved by the trier of fact.

In their fourth motion for summary judgment, the plaintiffs seek to preclude West Bend from advancing the affirmative defense of misrepresentation or concealment. West Bend seeks by summary judgment the opposite conclusion— that West Bend only issued the policy because of Gerhard's misrepresentations. (Dkt. 102, at 2).

Kansas law permits the recision of a contract grounded on the concealment of a material fact. "A matter is material if it is one to which a reasonable man would attach importance in determining his choice of action in the transaction in question." *Griffith v.*

*Byers Construction Co.*, 212 Kan. 65, 73, 510 P.2d 198 (1973). Thus, in the case of an insurance policy application, "a false statement is material if a reasonable insurance company, in determining its course of action during the investigation, would attach importance to the fact misrepresented. " *Pink Cadillac Bar and Grill, Inc. v. United States Fidelity and Guaranty Co.*, 22 Kan. App. 2d 944, 953-54, 925 P.2d 452 (1996) (citing *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179 (2d Cir.1984), *cert. denied*, 474 U.S. 826 (1985) and *Long v. Insurance Co. of North America*, 670 F.2d 930, 934 (10th Cir.1982)). In its motion, West Bend argues that the policy excludes both misrepresentation and fraud, and in light of the former, it need not demonstrate that the plaintiffs intended deception in the application process. *See National Bank of Andover v. Kansas Bankers Sur. Co.*, 290 Kan. 247, 257-61, 225 P.3d 707 (2010); *Pink Cadillac Bar and Grill*, 22 Kan. App. 2d 944, Syl. ¶ 5 (insurer may deny coverage based on misrepresentation exclusion without showing intent to defraud).

The plaintiffs respond that West Bend construes *Pink Cadillac* too broadly, as the plaintiff in that case requested a reliance instruction, but failed to object to the failure to give the requested instruction. While the Court of Appeals recognized the failure, it then squarely proceeded to conclude that the

> proposed instruction misstates the law as it pertains to an insurer's defense of concealment or misrepresentation. Other jurisdictions have distinguished common law fraud from this insurance defense. These jurisdictions recognize that, unlike an action for fraud, an insurer who raises the defense of concealment or misrepresentation does not have to establish that it actually relied on the concealment or misrepresentation or that it suffered an injury.

22 Kan.App.2d at 957.

Plaintiffs also suggest that *Pink Cadillac* is no longer good law following the Kansas supreme court's decision in *Chism v. Protective Life Ins.*, 290 Kan. 645, 234 P.3d 780 (2010). Similarly, the Intervenor Plaintiff First National Bank argues that *Chism* precludes rescission for anything less than fraud. (Dkt. 110, at 5). But the discussion of insurer reliance in *Chism* arose in the context of the insurer's invocation of "the general rule of law that an insurer has the right to rescind a policy *ab initio* for fraudulent misrepresentation

in the application process," a defense which is construed in accordance with common law fraud. 290 Kan. at 654. That is, the insurer did not have or invoke the existence of a specific policy exclusion for misrepresentation. Accordingly, the court finds that *Pink Cadillac* remains valid law, and that West Bend is entitled to relief under the exclusion by demonstration that the applicant withheld material information, whether or not an intent to defraud existed. *See National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 225 P.3d 707 (2010) (finding misrepresentation exclusion was not void as against public policy).

Plaintiffs also argue that under *Chism* West Bend should be estopped from invoking the exclusions for misrepresentation or fraud. In *Chism* and prior cases, the Kansas Supreme Court has recognized that an insured may estop an insurer from rescinding a policy on grounds of fraud if the allegedly false misrepresentations were actually caused by the agent rather than the applicant. *See Cooley v. National Life & Accid. Ins.*, 172 Kan. 10, 16, 238 P.2d 526, 531 (1952) (finding estoppel where application was "not asked a question contained in the application, [and the] agent enters a false answer"); *Schneider v. Washington Nat. Ins.*, 200 Kan. 380, 396, 437 P2d 798, 812 (1968) (recognizing split in authorities and following more lenient rule that estoppel may apply where agent generated false information in application, and applicant signed application in good faith without reading it); *Chism*, 290 Kan. at 647, 234 P.3d at 783 (applying estoppel where agent makes misrepresentations which cause applicant to give false answers). As noted earlier, the general, *Golden Rule* rule in Kansas is that an agent "employed to procure insurance becomes the agent of the person for whom the insurance is procured." *Golden Rule Ins.*, 47 Kan.App.2d 408, Syl. ¶ 9. Where a colorable claim of estoppel in the formation of the contract is raised, however, the State follows a different rule, holding that "an insurance agent ... making out an application for insurance acts as the agent of the company.'" *Chism*, 290 Kan. at 656 (quoting *Cooley*, 172 Kan. at 15-16).

West Bend does not address the plaintiffs' *Chism*-grounded estoppel argument in its Reply (Dkt. 124). Rather, West Bend addresses *Chism* only in the context of arguing (correctly) that the case does not alter Kansas law recognizing that the parties to an insurance contract are free to bargain for an exclusion of coverage for misrepresentations which fall short of common law fraud. Thus, as noted earlier, under the explicit policy exclusion, West Bend need not demonstrate that the plaintiffs acted with fraudulent intent. The present contract is a commercial insurance policy, issued to cover the operations of an ongoing business which Geldenhuys valued at approximately a quarter million dollars, and the plaintiffs have failed to demonstrate any reason for deeming the agreed-to contract exclusion as invalid, and that the policy should not be enforced exactly as written – that is, that coverage is excluded in the event of fraud *or other material misrepresentations falling short of fraud*.

On the other hand, the defendant has failed to show why the long-recognized doctrine of estoppel in the formation of the policy should not be applied here. Of course, *Chism* did not involve explicit policy exclusions for misrepresentation or fraud, and the insurer sought to defend against the claim through the doctrine of rescission. Rescission is itself an equitable doctrine, *see, e.g., Nordstrom v. Miller*, 227 Kan. 59, Syl. ¶ 10, 605 P.2d 545 (1980), and accordingly is itself subject to the equitable defense of estoppel. *See Chism*, 290 Kan. 646 Syl ¶ 7, 234 P.3d 782 (estoppel precludes insurer from "from setting up a defense of fraud on the part of the insured in the application process"). But West Bend has failed to show why the equitable remedy of estoppel should not also apply where an insurer relies on an explicit misrepresentation exclusion rather than equitable rescission. Of course, West Bend makes a strong factual argument that no such estoppel should exist under the facts of the case. It notes the inherently ambiguous, indeed contradictory testimony of Gerhard, and cite evidence showing that ultimately Carpenter presented Gerhard with a full and fair opportunity to review that application, which Gerhard signed.

All of the information contained in the application, either directly or indirectly, was derived from representations by the Geldenhuyses.

Nevertheless, these remain factual arguments. The Kansas Supreme Court has repeatedly emphasized that "[i]n cases where the truth of the representations or the facts surrounding the taking of the application are in dispute the questions presented are for a jury's determination." *Chism*, 290 Kan. at 657, 234 P.3d at 789 (quoting *Schneider*, 200 Kan. at 393, 437 P.2d 798). Accordingly, the court denies the defendant's argument (Dkt. 124, at 10) that summary judgment must be issued in its favor under the misrepresentation exclusion. Specifically, the court finds that a rational fact-finder could conclude that any misstatements in the application were not material in nature, given the circumstances of the case, or that a jury could determine the misrepresentations are solely attributable to the agent rather than the plaintiffs.

Finally, in addition to its earlier requests for summary judgment as to other issues, West Bend also seeks a summary judgment against the plaintiffs' claims for damage to business personal property. Specifically, West Bend argues that as plaintiffs are not seeking replacement coverage, they can only recover the actual cash value of the property. Yet both Tammie and Gerhard Geldenhuys specifically demurred from any assessment of the actual value of the property during their depositions, and they have not cited any expert testimony establishing the value of the property.

The court will deny the motion. Kansas law generally deems property owners competent to testify to the value of their property. *See Ultimate Chemical v. Surface Transp. Int' l*, 232 Kan. 727, 729–30, 658 P.2d 1008 (1983). The court finds that the Geldenhuys' prior demurral may form a basis for cross-examination by West Bend, but should not otherwise preclude Tammie Geldenhuys from testifying as to her understanding of the value of the alley or its contents.

To summarize, the court finds that jury questions exist as to the cause of the collapse, the status of the scoring monitors as personal property, and whether the claim is subject to the policy exclusions for dishonest or criminal conduct, or for misrepresentation or fraud. West Bend's affirmative defense under the misrepresentation exclusion does not require a showing of an intent to defraud. The policy exclusions for collapse or wear and tear are inapplicable in light of the specific coverage for collapse due to hidden decay, and "decay" in that special coverage does not require proof of rot or organic decomposition. The court denies the plaintiffs' request to reform the contract for mutual mistake, and to strike the affirmative defenses of misrepresentation or concealment.

IT IS ACCORDINGLY ORDERED this 7th day of February, 2013, that the Motions for Partial Summary Judgment of the plaintiffs (Dkt. 74, 80, 84, 105), and the Cross-Motion for Summary Judgment of the defendant (Dkt. 103) are hereby denied, except as to certain conclusions of noted herein.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE